IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**RAYMOND J. SANCHEZ,**

      **Plaintiff,**

vs.                                       No. CIV 03-576 LCS

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's Motion to Reverse and Remand (Doc. 9), filed October 17, 2003. The Commissioner of Social Security issued a final decision denying Plaintiff's application for supplemental security income. This matter comes before this Court pursuant to 28 U.S.C. § 636(c). The United States Magistrate Judge, having considered the Motion, briefs, administrative record, and applicable law, finds that this Motion is well-taken and should be **GRANTED**.

### I.  STANDARD OF REVIEW

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Sec'y of Health and Human Svcs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence requires more than a scintilla, but less than a preponderance, and is satisfied by such relevant evidence that a reasonable mind might accept to support the conclusion. *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988). The decision of an Administrative Law Judge ("ALJ") is not supported by substantial evidence if the evidence supporting the decision is

overwhelmed by other evidence on the record. *Id.* at 805.

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of at least twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. § 423(d)(1)(A)). The Secretary has established a five-step process for evaluating a disability claim. *Bowen v. Yuckert*, 482 U.S. 137 (1987). At the first four levels of the sequential evaluation process, the claimant must show that he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulation under 20 C.F.R. Part 404, Subpart P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. *See Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir. 1988). At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity ("RFC"), age, education, and prior work experience. *See Gatson v. Bowen*, 838 F.2d 442, 448 (10th Cir. 1988).

## II.  PROCEDURAL HISTORY

Plaintiff, now 20 years old, filed his application for supplemental security income on June 13, 2001, alleging disability commencing on April 10, 2001. (R. at 166.) Plaintiff's alleged disability was due to a seizure disorder and migraine headaches accompanied by vision problems. (R. at 116-17.) Plaintiff also claimed to have difficulty using his right side due to cerebral palsy. (R. at 56.) Plaintiff has a high school education and past relevant work in the pet department at

Wal-Mart.  (R. at 62; 57.)

Plaintiff's application for supplemental security income was denied at the initial level on October 18, 2001 (R. at 27-31) and at the reconsideration level on January 17, 2002.  (R. at 34-37.)  Plaintiff retained non-lawyer assistant Catalina Cordoba to represent him in this matter on December 10, 2001. (R. at 22.)  Plaintiff appealed the denial of his application by filing a Request for Hearing by Administrative Law Judge on January 28, 2002.  (R. at 38.)  The ALJ held a hearing on July 10, 2002, at which Plaintiff was represented by Catalina Cordoba.  (R. at 175.) Plaintiff and Judith Beard, a vocational expert, testified at the hearing.  (R. at 176.)

The ALJ issued his decision on August 30, 2002, analyzing Plaintiff's claim in accordance with the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993)(R. at 11.)  At the first step of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the filing of his application.  (R. at 15.)  At the second step, the ALJ determined that Plaintiff had severe impairments of the neurological and musculoskeletal body systems with a non-severe visual impairment.  (Id.)  At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's impairments did not meet or equal any of the impairments found in the Listing of Impairments ("Listings"), Appendix I, Subpart P, 20 C.F.R. §§ 401.1501-1599.  (Id.)  At step four, the ALJ found that Plaintiff, based on an assessment of Residual Functional Capacity, was unable to return to his past relevant work.  (R. at 17.)  He also found that Plaintiff's assertions that he did not retain the RFC to perform a range of light work activities were not credible.  (R. at 16.)  At step five, the ALJ found that, based on his RFC, Plaintiff retained the ability to perform a substantial range of light work and, as such, was not under a disability as defined in the Social

3

Security Act. (R. at 17.)

Plaintiff filed a Request for Review of Hearing Decision on October 29, 2002. (R. at 8.) On April 7, 2003, the Appeals Council denied Plaintiff's request for review. (R. at 5-6.) Hence, the decision of the ALJ became the final decision of the Commissioner for purposes of judicial review. Plaintiff filed the present action on May 14, 2003 through attorney Michael Liebman, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

### III. ANALYSIS AND FINDINGS

Plaintiff has a long history of seizure disorder, movement disorder and headaches apparently stemming from a traumatic brain injury suffered at three months of age.[1] (R. at 126.) The medical records available to the ALJ in this case date back to early 1997 when Plaintiff was thirteen years old. (R. at 127.) Plaintiff was seen in February of 1997 by John Ritterbusch, M.D. at Carrie Tingley Hospital. Dr. Ritterbusch's impression was of cerebral palsy with right supracondylar humeral fracture malunion. (Id.) Plaintiff was noted to have suffered a traumatic brain injury at age 3. (Id.) At that time, Plaintiff was able to ambulate without difficulty using an AFO brace. (Id.) Plaintiff was noted to use a right forearm splint occasionally. (Id.) Physical therapy was not recommended at the time. (Id.)

Plaintiff next saw Dr. Richard Radecki in April of 1997. (R. at 125-126.) Dr. Radecki opined that Plaintiff had a traumatic brain injury rather than cerebral palsy. (R. at 125.) Plaintiff was noted to have right hemiparetic spasticity as well as seizure abnormalities, for which Plaintiff

---

[1]The record is unclear as to when Plaintiff sustained the aforementioned injury. Some physicians' reports indicate the injury occurred when Plaintiff was 3 months of age. Other reports indicate the injury took place when Plaintiff was 3 years of age. Age of onset is not an issue before this Court.

had been placed on Dilantin.[2]  Right hemiparesis was visible on ambulation and upon running. (Id.)  Plaintiff's spasticity was noted to increase upon running.  Flexion posturing in the upper extremity and extension in internal rotation of the foot in the lower right extremity were also noted upon ambulation.  (Id.)  Neuropsychological testing was recommended.  Dr. Radecki thought that Dilantin might be the cause of Plaintiff's difficulties in school and recommended changing medications to Tegretol.[3]  Plaintiff's father described his seizures as first having some 'verbal battling' and then involvement of the right upper extremity quickly progressing to grand mal seizures which Plaintiff's mother had observed as tonic clonic total body involvement.  (R. at 126.)

Plaintiff received an Assistive Technology Evaluation from the Albuquerque Public Schools in January of 1998.  (R. at 93-97.)  He was receiving occupational therapy as needed and was participating in a regular curriculum except for 30 minutes per week of special education monitoring.  (R. at 93.)  Plaintiff's difficulties were noted to be in the areas of fine and gross motor activity and it was felt that difficulties in this area stemmed primarily from his orthopedic impairments.  (Id.)  Mr. Sanchez was noted to be unable to keep up with his coursework due to the pain and fatigue he experienced in his right upper extremity.  (R. at 97.)  It was recommended that he be allowed to use a word processor and printer to complete his writing assignments.  (Id.)

Plaintiff was again evaluated in February of 1998 at the Pediatric Rehabilitation Clinic at Carrie Tingley Hospital.  (R. at 121-123.)  Plaintiff was noted to have sustained a traumatic brain

---

[2]Dilantin is indicated for the control of generalized tonic-clonic (grand mal) and complex partial (psychomotor, temporal lobe) seizures.  *Physician's Desk Reference*, 2242 (54th ed. 2000).

[3]Tegretol is indicated for use as an anticonvulsant drug.  *PDR* at 2053.

5

injury at 3 months of age with resulting right-sided hemiparesis, as well as an orthopedic deformity of the right upper extremity due to a fracture sustained in early childhood. (R. at 121.) He had been switched to Depakote[4] for seizure control and his mother indicated that this treatment seemed to be working well. (Id.) Plaintiff denied headaches or difficulty concentrating, but noted that he had been having difficulty in school since the onset of his seizures. (Id.) Dr. Deborah McGrew again suggested that Mr. Sanchez undergo a neuropsychological evaluation. (Id.)

With regard to neuromuscular findings, Dr. McGrew noted that Mr. Sanchez exhibited a normal range of motion and strength on his left side. (R. at 122.) However, on the right side, he exhibited muscle wasting in the upper extremity. (Id.) Dystonic movements of the right hand when attempting to manipulate objects was also noted. (Id.) Surgical intervention for hemiparesis in the right upper extremity was not felt to be indicated at the time. (R. at 123.)

Plaintiff was seen by New Mexico Orthopaedic Associates in September of 1999. (R. at 137-38.) He complained of pain and a popping sensation in the right elbow over the past several months. (R. at 137.) He was noted to have clinically evident cubitus varus measuring approximately 20 degrees of the right elbow. Weakness and posturing were also evident in the right upper extremity. (Id.) Plaintiff was noted to be working in the pet department at Wal-Mart where he was frequently required to lift heavy bags of food. (Id.) It was felt that surgery was not indicated unless Plaintiff's elbow began interfering with his activity level. (Id.) Plaintiff was fitted with a hinged elbow brace for support and comfort. (Id.)

---

[4]Depakote is indicated as monotherapy and adjunctive therapy in the treatment of patients with complex partial seizures that occur either in isolation or in association with other types of seizures. *PDR* at 433.

An evaluation of Mr. Sanchez by the Albuquerque Public Schools in January of 2001 revealed a need for more special education classes due primarily to his fine and gross motor problems. (R. at 113.) It was noted that a smaller teacher/student ratio was needed to more closely monitor Plaintiff's medical needs. (R. at 111.) Among the modifications suggested for Plaintiff's educational environment were use of a computer and reduced written assignments when necessary, the opportunity to have instructions written, use of a calculator, and extended time for exams. (R. at 112.) It was noted that Plaintiff's grades would be based on a regular classroom standard. (Id.) Mr. Sanchez was placed in five special education classes and two regular education classes. (R. at 113.)

Plaintiff's medical records from July of 2001 indicate increasing problems with seizure activity. (R. at 133.) Mr. Sanchez and his family insisted he was taking his Depakote but tests to determine his medication levels had come back very low on several occasions. (Id.) Dr. Daniel Shibuya noted that Plaintiff had a history of seizure disorder and cerebral palsy. Right hemiparesis with contractures in the right hand was also noted. (Id.) Plaintiff indicated at this visit that he had been having persistent headaches following his last seizure. Dr. Shibuya started Plaintiff on Zonegran[5] with instructions to call back if the headaches persisted. (Id.)

Mr. Sanchez underwent a CT scan of the head without contrast in August of 2001. (R. at 132.) This examination revealed a large, low-density area in the left temporoparietal region of the brain consistent with old ischemic infarcts or an area of encephalomalacia. (Id.) There was no evidence of acute intracerebral hemorrhage or mass lesion. (Id.) A contrast enhanced CT scan

---

[5]Zonegran is indicated for the treatment of persistent partial seizures and as an adjunct to other epilepsy drugs for other types of seizure disorder. Zonegran may cause drowsiness, loss of muscle coordination and slowed thinking. Twersky, Ori, *FDA Approves New Epilepsy Drug for Persistent Seizures*, (March 28, 2000), *available at* http://my.webmd.com/content/article/22/1728_56052.1.

7

was recommended for further evaluation of these findings.  (Id.)

Plaintiff again saw Dr. Shibuya in September of 2001 for evaluation of his continued headaches.  (R. at 131.)  He was being treated with Neurontin[6] for his headaches and continued to take Zonegran for seizures.  (Id.)  Dr. Shibuya stated that he would begin Mr. Sanchez on a trial of Amitriptyline[7].  Amerge[8] was also given with instructions to call in for a prescription if the medication was effective.  (Id.)  Dr. Shibuya expressed concern with placing Plaintiff on stronger, faster acting triptan medications due to his seizure history.  (Id.)

An assessment performed by the Social Security Administration revealed that Plaintiff was most recently prescribed Depakote for his seizures but that recent blood levels indicated no detectable levels of the drug, despite assurances by claimant and his mother that claimant was taking the drug as prescribed.  (R. at 158.)  Plaintiff was noted to have been in special education classes in high school, but indicated this was for assistance with his writing.  (R. at 159.)  Medical consultant Dr. Green limited Plaintiff to no more than light forms of work, with additional postural limitations.  (Id.)  Dr. Green also limited his exposure to machinery due to his periodic seizure activity.  (Id.)  Due to Mr. Sanchez's right-sided hemiparesis, Dr. Green limited his reaching to frequent on the right and his handling and fingering to frequent on the right.  (Id.)

---

[6]Neurontin is indicated as an anticonvulsant drug.  Its usefulness in controlling chronic headaches is debated by experts.  Boyles, Salynn, *Epilepsy Drug may Reduce Daily Headaches; But Experts say Neurontin is not a Top Choice*, (December 22, 2003), *available at* http://my.webmd.com/content/article/22/1728_56052.1.

[7]Amitriptyline belongs to the class of drugs known as tricyclic antidepressants.  In low doses, these drugs may be used to treat chronic pain.  Drowsiness, blurred vision, and sedation or confusion are possible side effects. Tricyclic antidepressants may worsen symptoms of individuals with pre-existing seizure disorders.  Rowett, Dana L., *Tricyclic Antidepressants for Chronic Pain*, (March 6, 2003), *available at* http://my.webmd.com/hw/pain_management/ty6869.

[8]Amerge is used in the treatment of migraine headaches.  It is generally well-tolerated.  Side effects may include weakness, dizziness and drowsiness.  Rowett, Dana L., *Triptans (serotonin receptor agonists) for Migraine Headaches*, (July 18, 2003), *available at* http://my.web.md.com/hw/migraines/hw116449.

While it was noted that these limitations would erode the occupational base somewhat, Plaintiff was still thought to be capable of performing a number of light jobs that could be successfully performed by one-armed workers. (R. at 160.)

Plaintiff next saw Dr. Shibuya in April of 2002. (R. at 165.) It was noted that his seizures had been under good control on Zonegran since the last office visit in September of 2001. (Id.) Dr. Shibuya had started Plaintiff on Neurontin and then Inderal[9] for control of his headaches, which seemed to be increasing in frequency. (Id.) This combination of medications had initially been helpful, but Plaintiff noted that, over the past few months, his headaches had been increasing in frequency and severity. (Id.) Dr. Shibuya's impression was one of vascular-like headaches. (Id.) Inderal was to be increased and Amerge was to be tried cautiously with a prescription if the drug was helpful. (Id.)

Plaintiff was also evaluated by Dr. Alan Firestone in May of 2002. (R. at 116.) At that time, he complained of vision problems including clouding of vision or black spots appearing in the visual field. (Id.) These problems were believed to be stemming from Plaintiff's migraine headaches. (Id.)

## IV. DISCUSSION

In his Motion to Reverse and Remand Agency Decision, Plaintiff claims a number of errors. He claims that the ALJ failed to properly assess whether his medical conditions met a Listing under step three of the sequential evaluation. He also claims that the ALJ's step five determination that he could perform a range of light work was not supported by substantial

---

[9]Inderal is used for the prophylactic treatment of migraine headaches. *Migraine Headaches*; *available at* http://my.web.md.com/hw/migraines/hw116876.asp.

evidence. (Doc. 10.)

    **a.**    **Analysis at Step Three of the Sequential Evaluation**

Plaintiff first argues that the ALJ failed to properly assess whether his motor deficits met or equaled the impairments found in Section 11.07D in the Commissioner's Listing of Impairments. Mr. Sanchez contends that the evidence put forth demonstrated an impairment consistent with 20 C.F.R. Pt. 404, Subpt., P, App. 1, Section 11.07D for Cerebral Palsy with Disorganization of Motor Function as described in Section 11.04B. Section 11.04B describes Central Nervous System Vascular Accident with resulting significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dextrous movements, or gait and station. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 11.04B.

I find that the ALJ's analysis of Plaintiff's impairments at step three was not proper. It is not clear that the ALJ considered all the evidence relevant to a determination of whether Plaintiff's impairments met a Listing. It is well-established that an ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996). However, the record must demonstrate that the ALJ considered all of the evidence. *Id.* Further, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon as well as significantly probative evidence he rejects. *Clifton*, 79 F.3d at 1010 (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1987)("a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position.")).

In rendering his opinion that Plaintiff's impairments met none of the Listings, the ALJ

noted that certain of Mr. Sanchez's treating physicians believed he did not have cerebral palsy. (R. at 15-16.) The ALJ also found that Claimant's deformity in the right upper extremity was only minimal. (R. at 16.)

It is apparent from the record that several of Plaintiff's treating physicians diagnosed him with cerebral palsy as described in Listing 11.07. (R. at 127, 133.) The record also contains evidence that Plaintiff had more than a minimal deformity of the right upper extremity. Plaintiff had been unable to keep up with schoolwork due to pain and fatigue in the right upper extremity. (R. at 97.) His physicians also noticed muscle wasting in the right upper extremity as well as dystonic movements of that extremity when attempting to manipulate objects. (R. at 122.) The Social Security Administration's initial assessment of Plaintiff stated he could perform light jobs capable of being completed by one-armed workers (R. at 160), indicating that Plaintiff's difficulties with his right upper extremity were more than minimal.

It is not clear from the record that the ALJ considered this evidence. Therefore, the case must be remanded for further proceedings. *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)("The ALJ is charged with carefully considering all the relevant evidence and linking his findings with specific evidence...A bare conclusion is beyond meaningful judicial review.") On remand, the ALJ must consider all the evidence in determining whether Plaintiff's impairments meet one of the Listings.

      **b.**    **Analysis at Step Five of the Sequential Evaluation**

At step five of the sequential evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity given his residual functional capacity, age, education and prior work experience. *Gatson v. Bowen*, 838 F.2d 442, 448 (10th

Cir. 1988).   Plaintiff argues that the ALJ failed to reconcile the differences between the Vocational Expert's ("VE") testimony at the hearing and the descriptions of the jobs listed by the VE in the Dictionary of Occupational Titles ("DOT).

At the hearing the VE, based upon a hypothetical posed by the ALJ, named several jobs that a hypothetical individual with certain postural limitations could perform.  (R. at 214-215.) The jobs included Laundry Sorter, (DOT #361.687-014), Assembler, Printed Products, (DOT # 794.687-010), and Jewelry Preparer, (DOT # 700.687-062).  (Id.)  Plaintiff argues that the ALJ erred in failing to elicit enough evidence with regard to the skills required of the jobs listed by the VE.  The record does not indicate that the VE gave an opinion as to what jobs Plaintiff would be capable of performing.  (R. at 213-218.)  The ALJ posed three hypothetical questions to the VE regarding individuals with various postural limitations.  (Id.)  The ALJ's opinion adopts the jobs listed above as being jobs that Plaintiff could perform.  (R. at 17.)  However, the opinion does not state how the ALJ determined which of the hypothetical impairments applied to Plaintiff and how the requirements of the listed jobs matched Plaintiff's known limitations.  (Id.)

Determining the functional demands and job duties of specific jobs and matching those requirements to a claimant's limitations is the very task the ALJ must undertake at step five. *Haddock v. Apfel*, 196 F.3d 1084, 1089 (10th Cir. 1999).  An examination of the jobs listed by the VE raises questions as to whether these jobs were consistent with Plaintiff's known limitations.[10]  The ALJ has the responsibility of developing the record on this point.  *Id*.  When a discrepancy exists between the VE's opinion and the Dictionary of Occupational Titles with

---

[10]The Court further notes that a number of Plaintiff's medications have been known to induce drowsiness. Whether this side effect has may affect Plaintiff's Residual Functional Capacity is not presently an issue before this Court.

respect to a claimant, it is the ALJ's responsibility to elicit a reasonable explanation for this discrepancy before relying on the VE's opinion that the claimant could perform the listed jobs. *Id*.

Should the ALJ reach step five upon remand, he must elicit an opinion from the vocational expert with respect to the jobs Plaintiff could perform. The ALJ must then ensure that a discrepancy does not exist between the listed jobs and the Dictionary of Occupational Titles. *Id*.

Given the deficiencies found in the ALJ's step five analysis, the case must be remanded for further proceedings consistent with this opinion.

### V.    CONCLUSION

Upon review of the evidence presented in this Motion to Reverse and Remand for Rehearing, this Court has determined that the Commissioner did not properly analyze Plaintiff's limitations at step three and step five of the sequential analysis. On remand the ALJ must, at step three, analyze the Plaintiff's impairments in accordance with the law of this Circuit and make other findings consistent with this opinion. Should the ALJ reach step five upon remand, he must adequately develop the record in his questions to the Vocational Expert and make other findings consistent with this opinion. Accordingly, Plaintiff's Motion to Reverse and Remand for Rehearing is **GRANTED**.

**A JUDGMENT CONSISTENT WITH THIS OPINION SHALL ISSUE.**

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**